Richard Kellner, CA Bar No. 171416
rlk@kellnerlaw.com
KELLNER LAW GROUP PC
1180 South Beverly Drive, Suite 610
Los Angeles, California 90035
Telephone: 310-780-6759
Facsimile: 310-277-0635

Paul J. Lukas, MN Bar No. 22084X*
lukas@nka.com
Brock J. Specht, MN Bar No. 0388343*
bspecht@nka.com
Caroline E. Bressman, MN Bar No. 0400013*
cbressman@nka.com
NICHOLS KASTER, PLLP
4700 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
* *pro hac vice* applications forthcoming

ATTORNEYS FOR PLAINTIFFS AND THE
PROPOSED CLASS

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Chad Rocke and Christopher Collins, individually, as representatives of the class, and on behalf of the Allianz Asset Management of America, L.P. 401(k) Savings and Retirement Plan,<br><br>Plaintiffs,<br><br>v.<br><br>Allianz Asset Management of America, L.P., Administrative Plan Committee of the Allianz Asset Management of America, L.P. 401(k) Savings and Retirement Plan, Retirement Plan Committee of the Allianz Asset Management of America, L.P. 401(k) Savings and Retirement Plan, and John Does 1–30,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND RESTITUTION**<br><br>**(1) Breach of Fiduciary Duties under ERISA (29 U.S.C. § 1104)**<br>**(2) Failure to Monitor Fiduciaries** |

## **NATURE OF THE CASE**

1.      Plaintiffs Chad Rocke and Christopher Collins ("Plaintiffs"), individually and as representatives of the Class described herein, and on behalf of the Allianz Asset Management of America, L.P. 401(k) Savings and Retirement Plan ("Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA") against Allianz Asset Management of America, L.P. ("Allianz"), the Administrative Plan Committee of the Allianz Asset Management of America, L.P. 401(k) Savings and Retirement Plan ("Administrative Committee"), the Retirement Plan Committee of the Allianz Asset Management of America, L.P. 401(k) Savings and Retirement Plan ("Retirement Committee") (collectively, the "Committees"), and John Does 1–30 (collectively, "Defendants"). As described herein, Defendants have breached their fiduciary duties and engaged in unlawful self-dealing with respect to the Plan in violation of ERISA, to the detriment of the Plan and its participants. Plaintiffs bring this action to remedy this unlawful conduct, to recover losses to the Plan, and to obtain other appropriate relief as provided by ERISA.

## **PRELIMINARY STATEMENT**

2.      As of December 2021, Americans had approximately $11 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans.[1] Defined contribution plans have largely replaced defined benefit plans—or pension plans—that were predominant in previous generations.[2] Only around 11% of non-union U.S. workers in the private sector participate in a defined benefit plan.[3] By

---

[1] *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $394 Trillion in Fourth Quarter 2021* (Mar. 28, 2022), https://www.ici.org/statistical-report/ret_21_q4.
[2] *See* Bankrate, *Pensions Decline as 401(k) Plan Multiply*, at 4 (July 24, 2014), http://www.bankrate.com/finance/retirement/pensions-decline-as-401-k-plans-multiply-1.aspx.
[3] *See* Congressional Research Service, *Worker Participation in Employer-Sponsored Pensions: Data in Brief*, at 4 (last updated Nov. 23, 2021), https://fas.org/sgp/crs/misc/R43439.pdf.

**CLASS ACTION COMPLAINT**

contrast, approximately 47% of non-union U.S. workers in the private sector participate in a defined contribution plan.[4]

3.      The potential for disloyalty and imprudence is much greater in defined contribution plans than in defined benefit plans. In a defined benefit plan, the participant is entitled to a "fixed periodic payment." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999) (quotation omitted). As the employer must ensure the plan is sufficiently capitalized to make these payments, the employer bears all risks related to excessive fees and investment underperformance. *See id.* 439–40. Consequently, defined-benefit-plan employers and fiduciaries have every incentive to keep costs low and remove imprudent investments. But in a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). As the employee bears all risks related to excessive fees and investment underperformance, the employer has no incentive to keep costs low or remove imprudent investments.

4.      To protect retirement plan participants, ERISA imposes strict fiduciary duties of loyalty and prudence upon plan sponsors and fiduciaries. *See* 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (quotation omitted). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope, 29 U.S.C. § 1104(a)(1)(B).

5.      For investment management companies like Allianz, the potential for imprudent and disloyal conduct is especially high because the plan's fiduciaries can benefit the company through their administration of the plan by, for example, using proprietary investments that a non-conflicted and objective fiduciary would not select or retain. Indeed, in 2015, Defendants were accused of doing just that. Two plaintiffs

---

[4] *See id.*

**CLASS ACTION COMPLAINT**

filed a putative Rule 23 class action, on behalf of themselves, as representatives of the class, and on behalf of the Plan, against Defendants in the U.S. District Court for the Central District of California. *Urakhchin, et al. v. Allianz Asset Mgmt. of Am., L.P., et al.*, No. 8:15-cv-01614-JVS-JCG (C.D. Cal. Oct. 15, 2015) ("*Allianz I*").

6.    The plaintiffs alleged that Defendants maintained an all-proprietary lineup that included expensive, underperforming investments for Defendants' own benefit and at the expense of Plan participants. For years, Defendants employed a 50/50 strategy such that for every Allianz Global Investors ("Allianz GI") investment in the Plan, a PIMCO[5] investment was added as well, and vice versa. In prior years, this strategy included the funds selected for the Plan's default investment option, for which each participants' account was split between an Allianz GI target date fund and a PIMCO target date fund.

7.    The parties resolved the *Allianz I* action in a class action settlement agreement. Yet, even after the settlement, Defendants have continued to treat the Plan as an opportunity to promote AllianzGI and PIMCO investment products and maximize profits at the expense of the Plan and its participants. The opportunity for profits is even greater now, because the Plan currently holds nearly $2 billion in assets, more than twice as much as it held when the original lawsuit was filed. Thus, Defendants earn even more money through their self-interested management of the Plan and have more than recouped the amount paid to settle the lawsuit.

8.    Little else has changed since the settlement. Despite agreeing as part of the settlement to retain an independent consultant to evaluate the Plan's lineup and investment policy statement for a period of up to three years, Defendants still maintain an all-proprietary lineup. Although a handful of proprietary funds have been removed since the settlement (most of which were removed in conjunction with the fund's liquidation), Defendants still retain underperforming proprietary funds where an

---

[5] PIMCO was acquired by Allianz in 2000 and continues to operate as an autonomous Allianz subsidiary.

**CLASS ACTION COMPLAINT**

objective and prudent review of comparable investments in the marketplace would have revealed numerous superior nonproprietary investments. In one example, the Plan's AllianzGI target date funds suite (50% of the Plan's default investment option in prior years as explained above) has underperformed their benchmarks and superior nonproprietary options over the long-term leading up to and during the class period, yet they remained in the Plan until AllianzGI liquidated the funds altogether.

9.      Based on Defendants' selection and retention of their proprietary funds and the resulting harm to the Plan and its participants, Plaintiffs assert a claim against Defendants for breach of the fiduciary duties of loyalty and prudence. In connection with this claim, Plaintiffs seek to recover all losses to the Plan resulting from Defendants' fiduciary breaches, all profits earned by Defendants in connection with their breaches or the Plan's assets, and other appropriate relief.

## JURISDICTION AND VENUE

10.      Plaintiffs bring this action under 29 U.S.C. § 1132(a)(2) and (3), which permit participants in an employee retirement plan to pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

11.      This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

12.      Venue is proper under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found.

## THE PARTIES

### PLAINTIFFS

13.      Plaintiff Rocke resides in Aurora, Colorado. He has participated in the Plan since approximately November 2017 and is a current participant. As a Plan

**CLASS ACTION COMPLAINT**

participant, Plaintiff Rocke has been invested in at least the Virtus NFJ Mid-Cap Value Fund during the putative class period. As a result, he has been financially injured by Defendants' unlawful conduct. Plaintiff Rocke's account would be worth more today had Defendants not violated ERISA as described herein.

14.     Plaintiff Collins resides in Denver, Colorado. He was a participant in the Plan from approximately 2015 until approximately late 2020. As a Plan participant, Plaintiff Collins was also invested in at least the Virtus NFJ Mid-Cap Value Fund during the putative class period. As a result, he has been financially injured by Defendants' unlawful conduct. Plaintiff Collins's account would have been worth more at the time it was distributed from the Plan had Defendants not violated ERISA as described herein.

### THE PLAN

15.     The Plan was established on January 1, 2003 via the merger of certain predecessor plans (the PIMCO Savings Plan, the PIMCO Retirement Plan, the NACM 401(k) Plan, and the NACM Pension Plan). Prior to 2011, the Plan was known as the "Allianz Global Investors of America L.P. 401(k) Savings and Retirement Plan."

16.     According to recent Form 5500 filings, the Plan covers eligible employees and former employees of Allianz, Allianz Asset Management of America LLC, Allianz Asset Management U.S. Holding II LLC, Allianz Global Investors LLC, Allianz Global Investors Distributors LLC, Allianz Global Investors Fund Management LLC, Allianz Global Investors Managed Accounts LLC, Allianz Global Investors U.S. LLC, Pacific Investment Management Company LLC, and PIMCO Investments LLC. In addition, the Plan covers a small group of seconded and transferred U.S. employees of PIMCO Asia Limited, Pimco Asia Pte Ltd, and PIMCO Europe Ltd.

17.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29

**CLASS ACTION COMPLAINT**

U.S.C. § 1002(34). The Plan is a qualified plan under 26 U.S.C. § 401, commonly referred to as a "401(k) plan."

18.    From 2018 through the end of 2021 (the last year for which data is publicly available), the Plan had between 4,156 and 4,710 participants and approximately $1.1 billion to $1.9 billion in assets.

19.    Plan participants may direct their accounts to one or more investments selected by the Plan's fiduciaries. All investment options are proprietary AllianzGI and PIMCO collective investment trusts or mutual funds. As of the end of 2018, the Plan's menu consisted of four (4) proprietary collective trusts and 43 proprietary mutual fund investments.[6] By the end of 2021, the Plan's menu consisted of three (3) proprietary collective trusts and 36 proprietary mutual fund investments.

**DEFENDANTS**

*Allianz*

20.    Defendant Allianz is headquartered in Newport Beach, California.

21.    Allianz is identified as the "plan sponsor" in the Plan's Forms 5500 filed with the United States Department of Labor. *See* 29 U.S.C. § 1002(16)(B) (defining plan sponsor). As the plan sponsor, Allianz has ultimate decision-making authority with respect to the Plan and the management and administration of the Plan and the Plan's investments. Because Allianz exercises discretionary authority or discretionary control with respect to management and administration of the Plan and disposition of Plan assets, it is a functional fiduciary under 29 U.S.C. § 1002(21)(A).

22.    Allianz is also identified as the plan administrator in the Plan's Forms 5500. *See* 29 U.S.C. § 1002(16)(A) (defining plan administrator). As the plan administrator, Allianz is a named fiduciary of the Plan for purposes of ERISA. *See* 29 C.F.R. § 2509.75-8 at D-3.

---

[6] Target date funds ("TDFs") are generally offered as a suite of funds with target dates staggered 5 to 10 years apart, allowing the participant to choose the target date that aligns with their estimated retirement date. For purposes of this calculation, Plaintiffs count the entire suite of TDFs as a single investment.

23. To the extent that Allianz has delegated any of its fiduciary functions to others, it maintained fiduciary responsibilities with respect to the Plan. It is well-accepted that the authority to appoint, retain, and remove other plan fiduciaries constitutes discretionary authority or control over the management or administration of the plan, and thus confers fiduciary status under 29 U.S.C. § 1002(21)(A). *See* 29 C.F.R. § 2509.75-8 (D-4); *Liss v. Smith*, 991 F. Supp. 278, 310 (S.D.N.Y. 1998) ("It is by now well-established that the power to appoint plan trustees confers fiduciary status."). Further, the responsibility for appointing and removing other fiduciaries carries with it an accompanying duty to monitor the appointed fiduciaries, and to ensure that they are complying with the terms of the Plan and ERISA's statutory standards. *See* 29 C.F.R. § 2509.75-8 (FR-17); *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673, 691 (D. Conn. 2018) ("ERISA law imposes a duty to monitor appointees on fiduciaries with appointment power." (quotation omitted)).

***The Administrative Committee and the Retirement Committee***

24. According to the Plan's Form 5500 filings, the Committees assist Allianz with administration of the Plan.

25. In performance of its duties, the Committees exercise "authority or control respecting management or disposition of the Plan's assets" and are therefore fiduciaries under 29 U.S.C. § 1002(21)(A).

***The Doe Defendants***

26. The Doe Defendants are or were members of the Committees during the putative class period. Thus, each of the Doe Defendants are also fiduciaries under 29 U.S.C. § 1002(21)(A). Plaintiff does not currently know the identities of the Doe Defendants.

## LEGAL AND FACTUAL BACKGROUND

### ERISA FIDUCIARY DUTIES

27. ERISA imposes strict fiduciary duties of loyalty and prudence upon fiduciaries of retirement plans. 29 U.S.C. § 1104(a)(1) states, in relevant part:

**CLASS ACTION COMPLAINT**

[A] fiduciary shall discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A)    for the exclusive purpose of

(i)    providing benefits to participants and their beneficiaries; and

(ii)    defraying reasonable expenses of administering the plan;

(B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . .

28.    These ERISA fiduciary duties are "the highest known to the law." *Howard*, 100 F.3d at 1488; *accord Johnson v. Couturier*, 572 F.3d 1067, 1077 (9th Cir. 2009) ("[O]ur holding merely comports with congressional intent in establishing ERISA fiduciary duties as 'the highest known to the law.'") (quoting *Howard*). "A fiduciary's process must bear the marks of loyalty, skill, and diligence expected of an expert in the field. It is not enough to avoid misconduct, kickback schemes, and bad-faith dealings. The law expects more than good intentions. A pure heart and an empty head are not enough." *Sweda v. Univ. of Pa.*, 923 F.3d 320, 339 (3d Cir. 2019) (quotation omitted), *cert. denied*, 140 S. Ct. 2565 (2020).

### DUTY OF LOYALTY

29.    The duty of loyalty requires fiduciaries to act with "an eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000) (quoting *Donovan*, 680 F.2d at 271). "Perhaps the most fundamental duty of a [fiduciary] is that [it] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quoting G. Bogert et al., *Law of Trusts and Trustees* § 543 (rev. 2d ed. 1980)). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan

participants and beneficiaries. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added). "Breaches of the unwavering duty of loyalty occur when a fiduciary deviates from that single-minded devotion, placing its interests … above that of plan participants or beneficiaries." *Vellali*, 308 F. Supp. 3d at 688 (quotation omitted).

## DUTY OF PRUDENCE

30.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). "[A] fiduciary's conduct at all times must be reasonably supported in concept and must be implemented with proper care, skill, and caution." *Sweda*, 923 F.3d at 333 (quotation omitted). "[I]f there is indeed a 'hallmark' of fiduciary activity identified in the statute, it is prudence." *Id.*

31.     The duty of prudence includes "a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015); *see also Vellali*, 308 F. Supp. 3d at 683 ("Fiduciaries have a continuing duty … to monitor investments and remove imprudent ones." (quotation omitted)). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Tibble*, 135 S. Ct. at 1828 (quotation omitted).

32.     The duty of prudence necessarily entails consideration of investment costs. *See Sweda*, 923 F.3d at 328-29 ("Fiduciaries must … consider a plan's power … to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has

already selected." (quotation omitted)). At retirement, employees' benefits "are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826. "The process of selecting vendors and negotiating service fees can materially affect an employee's retirement income because every dollar spent on … investment management is a dollar that is not contributing to increasing the amount of the employee's retirement savings. Over time, excessive service fees can erode an employee's retirement savings to the tune of tens or hundreds of thousands of dollars." *Vellali*, 308 F. Supp. 3d at 678.[7]

33.    To protect retirement plan participants, ERISA requires plan fiduciaries to monitor plan expenses and ensure that they are reasonable. *See* 29 U.S.C. § 1104(a)(1)(A)(ii) ("[A] fiduciary shall discharge his duties … solely in the interest of participants … for the exclusive purpose of[] providing benefits … and defraying reasonable expenses of administering the plan[.]"); *Sweda*, 923 F.3d at 328 ("Fiduciaries must … understand and monitor plan expenses."); *Carrigan v. Xerox Corp.*, 2022 WL 1137230, at *5 (D. Conn. Apr. 18, 2022) ("[A] plan fiduciary's duty of prudence incorporates an ongoing duty to monitor the prudence of investment options and recordkeeping fees, in order to be cost-conscious in administering their duties."); *accord* Restatement (Third) of Trusts § 88, cmt. a (2007) ("Implicit in a trustee's fiduciary duties is a duty to be cost conscious.").[8]

---

[7] The DOL and SEC have also warned that although the fees and costs associated with investment products and services may seem small, over time they can have a significant impact on an investor's portfolio. *See* DOL, *A Look at 401(k) Plan Fees*, at 1-2 (2013), *available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (cautioning that 1% difference annually can reduce the investor's account balance at retirement by 28%); SEC Investor Bulletin, *How Fees and Expenses Affect Your Investment Portfolio*, at 1, 3 (2014), *available at* https://www.sec.gov/investor/alerts/ib_fees_expenses.pdf.

[8] The legal construction of an ERISA fiduciary's duties is "derived from the common law of trusts." *Tibble*, 135 S. Ct. at 1828 (quotation omitted). Therefore "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Id.*

**INVESTMENT OPTIONS IN DEFINED CONTRIBUTION PLANS: TARGET DATE FUNDS**

34.    A common 401(k) menu option is a target date fund. These options provide exposure to a variety of asset classes, primarily equity and fixed income securities, with an investment mix that changes to become more conservative as the fund's target date approaches. Target date funds are generally offered as a suite of funds with target dates staggered 5 to 10 years apart, allowing the participant to choose the target date that aligns with their estimated retirement date. Target date funds typically use a "fund of funds" structure, meaning that each fund invests in other pooled investment vehicles in proportions determined by the manager of the funds.

35.    Target date funds are associated with the "set it and forget it" approach to investing by 401(k) plan participants. Participants who invest in a target date fund typically do not expect to change their selection over time. Instead, participants rely on the investment manager to rebalance the fund and implement a sound investment strategy for their account over their retirement saving horizon.

36.    Defined contribution plans have increasingly relied on target date funds to provide participants with diversified investment options. In 2006, only 32% of 401(k) plans offered target date funds, but that number has increased to 86% as of 2019.[9] Likewise, the share of defined contribution plan assets invested in target date funds increased from 3% to 27% during the same time period.[10]

37.    In 2013, the "increasingly popular" decision by fiduciaries to offer target date funds caused the U.S. Department of Labor, the federal agency tasked with enforcing ERISA, to issue "guidance to assist plan fiduciaries in selecting and monitoring TDFs."[11] The DOL found that target date funds are "attractive investment

---

[9] INVESTMENT COMPANY INSTITUTE, *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2019* (Sept. 2022), https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.
[10] *Id.*
[11] *See* Dep't of Labor, *Target Date Retirement Funds – Tips for ERISA Plan*

**CLASS ACTION COMPLAINT**

options for employees who do not want to actively manage their retirement savings." However, the DOL also found that "considerable differences" exist between target date fund providers in a highly competitive marketplace. Thus, the DOL emphasized the "important" role fiduciaries play in selecting a target date product for their plans.[12]

### INDEX FUNDS

38.    Another common 401(k) menu option is an index fund, which is a type of mutual fund with a portfolio designed to track the components of a financial market index. An index fund provides broad market exposure and has a passive investment strategy, which results in low expense ratios.

39.    Offering index funds in 401(k) plans is "nearly universal." In 2019, 94.8% of all 401(k) plans offered at least one index fund. In the same year, 99.2% of 401(k) plans with more than $1 billion in assets offered at least one index fund.[13]

### CAPITAL PRESERVATION OPTIONS

40.    Another common 401(k) menu offering is a low-risk, liquid option designed for capital preservation. Indeed, for plans like the Plan that allow participants to make frequent changes to their investments, offering an "income producing, low risk, liquid" option is necessary to satisfy the requirements of ERISA § 404(c). *See* 29 C.F.R. § 2550.404c-1(b)(2)(ii)(C)(ii).

41.    Several types of investment products offer capital preservation. Money market funds are mutual funds that invest only in very short-term debt securities, with the goal of minimizing liquidity risk and maintaining a stable asset value. Another common capital preservation product in 401(k) plans is a stable value fund. Stable value funds invest in longer duration debt securities than money market funds, as well as other assets, and therefore offer higher income potential. To protect against loss,

---

*Fiduciaries* (Feb. 2013), *available at*
https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/factsheets/target-date-retirement-funds.pdf
[12] *See id.*
[13] INVESTMENT COMPANY INSTITUTE, *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2019* (Sept. 2022), https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.

**CLASS ACTION COMPLAINT**

an investor's principal is covered by a contract with an insurer, which helps smooth out investment losses and gains to achieve stability and liquidity similar to money market funds.

42.     Money market funds and guaranteed investment contracts are ubiquitous in large 401(k) plans. Specifically, in 2019, 78% of 401(k) plans with more than $1 billion in assets offered a money market fund in their lineup.[14] In that same year, 76.2% of 401(k) plans with more than $1 billion in assets offered a guaranteed investment contract in their lineup.[15]

## DEFENDANTS' VIOLATIONS OF ERISA

**I.     DEFENDANTS' PROCESS FOR SELECTING AND MONITORING INVESTMENTS WAS IMPRUDENT AND TAINTED BY SELF-INTEREST**

43.     Although using proprietary options is not a *per se* breach of the duty of prudence or loyalty, a fiduciary's process for selecting and monitoring proprietary investments is subject to the same duties of loyalty and prudence that apply to the selection and monitoring of other investments. Based on Defendants' decision to maintain an all-proprietary lineup in lieu of *any* less expensive and otherwise superior nonproprietary alternatives, it is reasonable to infer that Defendants' process for selecting and monitoring the Allianz Funds was imprudent and disloyal.

**A.     Defendants Fail to Perform a Thorough, Objective Analysis of the Plan's Proprietary Funds**

44.     In 2015, two plaintiffs, on behalf of themselves and as representatives of a Rule 23 class, as well as on behalf of the Plan, filed an ERISA action in the U.S. District Court for the Central District of California. Compl., *Urakhchin, et al. v. Allianz Asset Mgmt. of Am., L.P., et al.*, No. 8:15-cv-01614-JVS-JCG (C.D. Cal. Oct. 15, 2015). The lawsuit alleged that the Plan's fiduciaries imprudently managed the Plan's investments and maintained a Plan lineup consisting exclusively of funds

---

[14] *See id.*
[15] *See id.*

**CLASS ACTION COMPLAINT**

managed by entities affiliated with the Plan sponsor, without considering alternative investments from other companies that were less expensive and performed better in many cases. 1st Am. Compl. ¶ 5, *Urakhchin, et al. v. Allianz Asset Mgmt. of Am., L.P., et al.*, No. 8:15-cv-01614-JVS-JCG (C.D. Cal. Jan. 6, 2016).

45.     The lawsuit culminated in a settlement after the parties fully briefed Defendants' motion for summary judgment. ECF No. 174-1 at 10, *Urakhchin, et al. v. Allianz Asset Mgmt. of Am., L.P., et al.*, No. 8:15-cv-01614-JVS-JCG (C.D. Cal. Dec. 26, 2017). One of the terms of the settlement agreement was that the Plan was to retain the services of an unaffiliated investment consultant to provide an annual evaluation of the Plan's investment lineup and review the Plan's investment policy statement. *Id.* at 12.

46.     Despite the settlement agreement's terms and despite having faced an ERISA class action, Defendants continue to employ disloyal and imprudent practices in maintaining the Plan's investment lineup that existed well before the prior litigation.

47.     For example, Defendants have retained the vast majority of the Plan's proprietary mutual funds. Specifically, in 2018 no changes to the Plan's investment lineup were made. In 2019, Defendants removed only one AllianzGI collective investment trust. In 2020, AllianzGI liquidated seven AllianzGI mutual funds as well as its proprietary target date funds, while Defendants maintained these funds in the Plan up until liquidation. Finally, in 2021, the Plan removed one AllianzGI mutual fund and replaced it with another AllianzGI mutual fund.

48.     Significantly, at no point since the *Allianz I* settlement have Defendants offered any non-proprietary investment options in the Plan. Moreover, Defendants continue to retain the vast majority of the proprietary funds that were included in the Plan prior to the settlement, with only two funds being removed for reasons other than their liquidation by the fund manager.

**CLASS ACTION COMPLAINT**

49.     As described more fully below, the liquidation and removal of a handful of proprietary funds does not meet Defendants' fiduciary obligations. First, Defendants' changes to the Plan's lineup did not eliminate many of the expensive and underperforming proprietary funds that continued to harm the Plan and its participants into the statutory period, as described more fully below. Second, many of the changes were made only after the Funds were liquidated as a matter of business necessity and not as a product of a prudent and loyal fiduciary process. Finally, the Plan is still saddled with Defendants' philosophy of limiting the Plan's options to only proprietary options, reflecting Defendants' imprudent and disloyal decisions.

**B.      Defendants Continued to Select a 50/50 Mix of AllianzGI and PIMCO Funds Based on Corporate Business Considerations**

50.     The Committees selected funds for the Plan based on corporate business considerations, rather than a prudent process focused on the best interests of Plan participants. Specifically, the Committees advanced an agenda whereby AllianzGI funds would be proposed for addition to the Plan whenever a PIMCO fund was being proposed, and vice versa.

51.     For example, the selection of the Plan's default investment option (Qualified Default Investment Alternative, or "QDIA") was driven by a compromise between AllianzGI and PIMCO, rather than by a prudent process. In January 2013, the Committees adopted a 50/50 mix of AllianzGI and PIMCO target date funds as the Plan's QDIA. In other words, 50% of a person's Plan account would be invested in the AllianzGI target date fund, and the other 50% would be invested in the PIMCO target date fund. The 50/50 split of AllianzGI and PIMCO proprietary target date funds continued for several years. This arrangement reflected an internal conflict within the Committees over whose target date fund would be used in the Plan, or whether the Committees should "split the 401(k) into 2, one PIMCO and one AGI," according to an email between Committee members from AllianzGI in September 2012.

**CLASS ACTION COMPLAINT**

52.     The 50/50 split of AllianzGI and PIMCO proprietary funds extended beyond just the target date funds and to the Plan as a whole. The Plan largely offered a nearly even amount of AllianzGI proprietary funds and PIMCO proprietary funds during most of the statutory period. Specifically, as of the end of 2018, the Plan offered 20 AllianzGI investments and 25 PIMCO investments apart from target date funds. As of the end of 2019, the Plan offered 20 AllianzGI investments and 24 PIMCO investments apart from target date funds. Defendants' clear intent to allocate roughly half of the Plan's assets to AllianzGI funds and half to PIMCO funds was not the product of a prudent, loyal, and objective evaluation of the merits of each fund, but instead was intended to appease internal corporate concerns stemming from the conflict of interest created by the Plan's use of proprietary funds.

**C.     Defendants' Use of Proprietary Funds Caused Participants to Incur Excessive Fees**

53.     From 2018 through the present, the Plan only offers investments managed by either AllianzGI or PIMCO (with the exception of a self-directed brokerage account ("SDBA")), both of which are subsidiaries of Allianz.

54.     The AllianzGI and PIMCO proprietary mutual funds are actively managed, and they charge an annual operating expense that is paid to AllianzGI or PIMCO and deducted from the rate of return of the fund. While a fiduciary may consider higher-cost, actively managed mutual funds as an alternative to lower-cost funds, "[a]ctive strategies . . . entail investigation and analysis expenses and tend to increase general transaction costs. . . . [T]hese added costs . . . must be justified by realistically evaluated return expectations." *See* Restatement (Third) of Trusts § 90 cmt. h(2); *see also id.* § 90 cmt. (b) ("[C]ost-conscious management is fundamental to prudence in the investment function."). While these additional fees may be a lucrative source of revenue for fund managers like AllianzGI and PIMCO, they can have a deleterious effect on participants. As a result, experts in the field advise that plan fiduciaries "should adopt passively managed funds as the default choice for their

plans" and include actively managed strategies only where "[a]ctive managers who can add value exist (after fees) in the asset category" and "[t]he committee can identify and hire those managers."[16] As discussed below, the proprietary funds' performance did not justify their higher cost.

55.    Specifically, at the end of 2018, the Plan offered 4 proprietary collective trust funds, 43 proprietary mutual funds, and an SDBA. The investment options included 2 target-date mutual fund series, 6 balanced funds, 13 domestic equity funds, 9 global/international equity funds, 9 domestic bond funds, 4 international bond funds, and 4 specialty funds.[17] According to the Plan's Form 5500, as of the end of 2018, the Plan had approximately $1.1 billion in assets, consisting primarily of approximately $880 million in proprietary mutual funds and $52 million in proprietary collective trust funds.

56.    At the end of 2020, the Plan offered 3 proprietary collective trust funds, 36 proprietary mutual funds, and an SDBA. The investment options included 1 target-date mutual fund series, 6 balanced funds, 10 domestic equity funds, 6 global/international equity funds, 9 domestic bond funds, 4 international bond funds, and 3 specialty funds. By the end of 2020, the Plan's assets had increased to approximately $1.6 billion, consisting primarily of approximately $1.2 billion in proprietary mutual funds and $41 million in proprietary collective trust funds.

57.    Significantly, throughout the statutory period, the Plan did not offer lower cost investment offerings that are ubiquitous in similarly sized 401(k) plans, including index funds and capital preservation funds. This is not a coincidence—as of this complaint's filing, neither AllianzGI nor PIMCO manage a proprietary index fund or a capital preservation fund. The reasonable inference is that Defendants deliberately failed to consider inclusion of any index funds or capital preservation

---

[16] Jeffrey V. Bailey & Kurt D. Winkelmann, DEFINED CONTRIBUTION PLANS: CHALLENGES AND OPPORTUNITIES FOR PLAN SPONSORS 116 (CFA Institute Research Foundation, 2021).

[17] "Specialty funds" includes funds focusing on commodities, natural resources, real estate, and technology sectors.

**CLASS ACTION COMPLAINT**

funds within the Plan's investment menu, not as a result of a loyal and prudent fiduciary process, but because to do so would require them to offer non-proprietary products.

58.    Defendants' decision to offer an all-proprietary lineup and to exclude lower cost index funds or capital preservation funds resulted in an unjustifiably high total plan cost during the statutory period. Taking into account all administrative and investment expenses within the Plan, and using year-end balances (as reported on the Form 5500 filings) and publicly available information regarding each investment's expenses, Plaintiffs estimate the total plan cost for 2019 to be 0.84% (or approximately $8.7 million in expenses of the $1.04 billion in Plan assets). This total plan cost of 0.84% is extremely high for a defined-contribution plan with over $1 billion in assets. In 2019, the most recent year for which average total plan cost data is available, the average total plan cost for plans with more than $1 billion in assets was 0.26%. 90% percent of plans with over $1 billion in assets had total plan costs of less than 0.44% in 2019, placing the Plan's total costs at a level nearly twice that of the 90th percentile and over three times the median.

59.    Had the Plan limited its expenses to the average total cost of 0.26% for similarly sized plans, Plan participants would have saved approximately $6 million in fees in 2019 alone. These grossly excessive costs are attributable to the Defendants' retention of high-cost, proprietary mutual funds from AllianzGI and PIMCO.

60.    Despite the high cost of the proprietary investments within the Plan, Defendants failed to consider, let alone investigate, the prudence of other investments (i.e., mutual funds or other investment products outside of AllianzGI and PIMCO). This failure to engage in a prudent investment selection and monitoring process and the subsequent failure to remove these imprudent investments constitute a breach of fiduciary duties of loyalty and prudence under ERISA.

61.    Had Defendants prudently monitored the investments within the Plan to ensure that the Plan's designated investment alternatives were not charging excessive

**CLASS ACTION COMPLAINT**

fees, in a process that was not tainted by self-interest, Defendants would have removed the Plan's investments in favor of investments outside of AllianzGI and PIMCO, such as the ones listed below (all of which were available to Defendants), that offered similar or superior performance at significantly less expense. As a result of these breaches of the duties of loyalty and prudence, Plan participants have paid millions of dollars in excess fees every year.

### D.    Defendants Failed to Remove Underperforming Proprietary Funds

62.    In part because of the high fees associated with the AllianzGI and PIMCO proprietary investment products, these investments tended to underperform, costing the Plan tens of millions of dollars in lost benefits that participants would have had in their accounts had the Plan's investments been managed in a prudent and impartial manner. A prudent fiduciary offering proprietary high-fee options like the AllianzGI and PIMCO Funds would continuously monitor whether the higher total plan cost as a result of using an exclusively all-proprietary lineup was justified by a reasonable expectation of increased returns. *See Baker*, 2020 WL 8575183, at *1 (noting that although ERISA "permits a financial services firm to offer its proprietary funds in its retirement plan . . . an ERISA fiduciary has 'a continuing duty to monitor [plan] investments and remove imprudent ones.'" (citations omitted)). Defendants failed to do so and maintained an investment lineup whose actively managed funds were entirely proprietary despite significant and prolonged underperformance in comparison to benchmarks and superior investment alternatives managed in a similar style.

63.    One example of imprudently retained funds are AllianzGI's target date funds. These funds consistently and materially trailed their prospectus benchmarks. They also underperformed when compared to other target date funds that, like the AllianzGI target date funds, utilize a "through retirement" glide path, are actively managed, and allocate similar amounts to equity and fixed income securities along their respective glide paths resulting in similar investment objectives and risks.

Nevertheless, they remained in the plan until the funds were liquidated, on or about September 15, 2020. A performance comparison of the AllianzGI Retirement 2040 fund illustrates the suite's shortcomings:

| Fund (Ticker) | 5-Year Performance (12/31/17) | 10-Year Performance (12/31/18) | 10-Year Performance (12/31/19) | 10-Year Performance (12/31/20) |
|---|---|---|---|---|
| AllianzGI Retirement 2040 R6 (AVTIX) | 8.23% | 8.51% | 7.38% | (Liquidated) |
| *Prospectus Benchmark* | | | | |
| Morningstar Lifetime Moderate 2040 TR USD | 10.84% | 10.32% | 9.68% | n/a |
| *Fund Comparators* | | | | |
| American Funds 2040 Target Date Retirement R6 (RFGTX) | 12.45% | 11.19% | 10.54% | n/a |
| Fidelity Freedom 2040 (FFFFX) | 11.14% | 9.79% | 9.26% | n/a |
| Principal LifeTime 2040 Inst. (PTDIX) | 10.39% | 9.82% | 9.45% | n/a |

64.    This underperformance versus its prospective benchmark was the product of the AllianzGI managers' lack of skill, and not its risk profile, as demonstrated through an analysis of the fund's alpha.[18] The fund carried an inferior alpha during the rolling ten-year periods through the class period in comparison to appropriate marketplace alternatives, as demonstrated below:

---

[18] Alpha is a metric used to measure a manager's skill on a risk-adjusted basis. Positive alpha demonstrates skill, an alpha of zero demonstrates zero skill, and negative alpha shows the manager made decisions that were worse than simply tracking the benchmark. The calculation benchmark for alpha is the relevant Morningstar Lifetime Moderate index.

**CLASS ACTION COMPLAINT**

| Fund (Ticker) | 5-Year Alpha (12/31/17) | 10-Year Alpha (12/31/18) | 10-Year Alpha (12/31/19) |
|---|---|---|---|
| AllianzGI Retirement 2040 R6 (AVTIX) | -0.61 | -0.77 | -1.43 |
| *Fund Comparators* | | | |
| American Funds 2040 Target Date Retirement R6 (RFGTX) | 2.06 | 1.62 | 1.40 |
| Fidelity Freedom 2040 (FFFFX) | 0.38 | -0.23 | -0.32 |
| Principal LifeTime 2040 Inst. (PTDIX) | 0.38 | -0.11 | 0.03 |

65.    A prudent fiduciary would have removed the AllianzGI target date funds from the Plan given their significant underperformance and lack of skill leading up to and throughout the statutory period. The fact that Defendants retained the AllianzGI proprietary target date funds in spite of their consistent underperformance, negative alpha, and superior alternatives in the marketplace, supports an inference that Defendants' process for monitoring the Plan's investments was self-interested and imprudent. *See* DOL Advisory Op. 88-16A, 1988 WL 222716, at *3; Restatement (Third) of Trust § 90, cmt. d ("The trustee must give reasonably careful consideration to both the formulation and implementation of an appropriate investment strategy, with investments to be selected and reviewed in a manner reasonably appropriate to that strategy. Ordinarily this involves obtaining relevant information about . . . the nature and characteristics of ***available investment alternatives***.") (emphasis added).[19]

66.    Another example of an imprudently retained fund is the Virtus NFJ Mid Cap Value Fund. This Fund invests in common stocks and other equity securities of companies with medium market capitalizations, seeking long-term growth of capital

_____

[19] *Accord Tussey v. ABB, Inc.*, 850 F.3d 951, 957 (8th Cir. 2017) (evidence of disloyalty included "not considering other possible" investments); *Goldenberg v. Indel, Inc.*, 741 F. Supp. 2d 618, 636 (D.N.J. 2010) ("Whether an investment decision could have been the result of prudent investing depends on the ***alternatives available*** to the fiduciary to accomplish the same purpose, in light of all the other relevant information about the investments.") (emphasis added); *Davidson v. Cook*, 567 F. Supp. 225, 236 (E.D. Va. 1983) ("The fiduciaries did not . . . compare [the loan investment] to other ***available investments***, but instead did their best to accommodate the [sponsor's] needs.") (emphasis added).

and income. Unfortunately for participants, the Virtus NFJ Mid Cap Value Fund has failed to meet its objectives.

67.     On a 10-year basis, the Virtus NFJ Mid Cap Value Fund has lagged its prospectus benchmark and funds that share similar investment objectives and risk throughout the statutory period. That is, each fund benchmarks its performance to the Russell Mid Cap Value index, seeks long-term capital appreciation, invests at least 90% of their assets in domestic stocks, holds at least 70 stocks, concentrates between 16% and 20% of their assets in their top ten holdings, and invests in companies with market capitalizations within the range of the Russell Mid Cap Value index that are believed to have stock prices that do not reflect their intrinsic values:

| Fund (Ticker) | 10-Year Performance (12/31/17) | 10-Year Performance (12/31/18) | 10-Year Performance (12/31/19) | 10-Year Performance (12/31/20) | 10-Year Performance (12/31/21) |
|---|---|---|---|---|---|
| Virtus NFJ Mid Cap Value R6 (ANPRX) | 7.62% | 11.40% | 11.13% | 9.32% | 12.14% |
| *Prospectus Benchmark* | | | | | |
| Russell Mid Cap Value TR USD | 9.10% | 13.03% | 12.41% | 10.49% | 13.44% |
| *Fund Comparators* | | | | | |
| JHancock Disciplined Value Mid Cap R6 (JVMRX) | 10.56% | 14.35% | 13.45% | 11.75% | 14.39% |
| JPMorgan Mid Cap Value R6 (JMVYX) | 9.61% | 12.67% | 12.66% | 10.37% | 13.04% |
| Victory Sycamore Established Value R6 (VEVRX) | 10.68% | 13.36% | 12.90% | 11.62% | 14.76% |

**CLASS ACTION COMPLAINT**

68.     Again, Virtus NFJ Mid Cap Value Fund's underperformance versus its benchmark and fund comparators was the product of the Fund managers' lack of skill, and not its risk profile, as demonstrated through an analysis of the Fund's alpha.[20] In fact, the Fund's alphas were consistently negative and trailed its comparators' alphas over rolling ten-year periods:

| Fund | 10-Year Alpha (12/31/17) | 10-Year Alpha (12/31/18) | 10-Year Alpha (12/31/19) | 10-Year Alpha (12/31/20) | 10-Year Alpha (12/31/21) |
|---|---|---|---|---|---|
| Virtus NFJ Mid Cap Value R6 (ANPRX) | -0.58 | -0.41 | -0.51 | -0.45 | -0.27 |
| *Fund Comparators* | | | | | |
| JHancock Disciplined Value Mid Cap R6 (JVMRX) | 2.89 | 1.62 | 0.67 | 1.12 | 0.88 |
| JPMorgan Mid Cap Value R6 (JMVYX) | 1.50 | 1.18 | 1.21 | 0.41 | 0.14 |
| Victory Sycamore Established Value R6 (VEVRX) | 2.46 | 1.59 | 0.96 | 1.43 | 1.68 |

69.     A prudent fiduciary would have removed the Virtus NFJ Mid Cap Value Fund from the Plan given its significant underperformance and excessive risk throughout the statutory period. The fact that Defendants retained this proprietary fund in spite of its consistent underperformance of its benchmark, negative alpha, and superior alternatives in the marketplace, supports an inference that Defendants' process for monitoring the Plan's investments was self-interested and imprudent.

70.     Yet another example of a fund imprudently retained for the Plan is Virtus Silvant Focused Growth Fund. This Fund seeks capital appreciation by primarily investing in common stocks of companies with large market capitalizations that exhibit growth potential. Like the Virtus NFJ Mid Cap Value Fund, however, this Fund has failed to meet this objective.

_____

[20] The alpha calculation benchmark is the Russell Mid Cap Value TR USD index.

**CLASS ACTION COMPLAINT**

71.     On a 10-year basis, the Virtus Silvant Focused Growth Fund has lagged its prospectus benchmark and funds that share similar investment objectives and risk throughout the statutory period. That is, each fund benchmarks its performance to the Russell 1000 Growth index, seeks long-term capital appreciation, invests at least 90% of their assets in domestic stocks, holds fewer than 60 stocks, concentrates at least half of their assets in their top ten holdings, and invests in companies with market capitalizations within the range of the Russell 1000 Growth index that are believed to have potential for growth:

| Fund (Ticker) | 10-Year Performance (12/31/17) | 10-Year Performance (12/31/18) | 10-Year Performance (12/31/19) | 10-Year Performance (12/31/20) | 10-Year Performance (12/31/21) |
|---|---|---|---|---|---|
| Virtus Silvant Focused Growth R6 (AFGFX) | 8.83% | 13.49% | 13.67% | 16.94% | 19.43% |
| *Prospectus Benchmark* | | | | | |
| Russell 1000 Growth TR USD | 10.00% | 15.29% | 15.22% | 17.21% | 19.79% |
| *Fund Comparators* | | | | | |
| AB Large Cap Growth I (ALLIX) | 11.53% | 16.03% | 15.37% | 17.73% | 20.82% |
| Putnam Growth Opportunities R6 (PGOEX) | 10.49% | 15.73% | 15.38% | 17.35% | 20.24% |
| T. Rowe Price Large Cap Growth I (TRLGX) | 11.60% | 18.12% | 16.04% | 18.18% | 20.84% |

72.     Once again, Virtus Silvant Focused Growth Fund's underperformance versus its benchmark and fund comparators was the product of the Fund managers' lack of skill, and not its risk profile, as demonstrated through an analysis of the Fund's

alpha.[21] In fact, the Fund's alphas were consistently negative and trailed its comparators' alphas over rolling ten-year periods:

| Fund | 10-Year Alpha (12/31/17) | 10-Year Alpha (12/31/18) | 10-Year Alpha (12/31/19) | 10-Year Alpha (12/31/20) | 10-Year Alpha (12/31/21) |
|---|---|---|---|---|---|
| Virtus Silvant Focused Growth R6 (AFGFX) | -0.98 | -1.90 | -2.02 | -1.30 | -1.32 |
| *Fund Comparators* | | | | | |
| AB Large Cap Growth I (ALLIX) | 1.30 | 0.55 | -0.03 | 1.57 | 2.60 |
| Putnam Growth Opportunities R6 (PGOEX) | 0.05 | -0.51 | -0.76 | -0.19 | 0.52 |
| T. Rowe Price Large Cap Growth I (TRLGX) | 0.63 | 1.34 | -0.34 | 0.24 | 0.80 |

73.    The foregoing examples are illustrative of overall struggles with Defendants' proprietary funds generally. Given the poor track record of the AllianzGI Funds, as well as the lack of utilization among fiduciaries of other 401(k) plans for some AllianzGI Funds, it was imprudent to retain these funds in the Plan. Defendants improperly retained these funds to serve their own business interests, not participants' interests, and generate additional investment fee income for Defendants. The retention of the Plan's proprietary funds under these circumstances is indicative of Defendants' breaches of their fiduciary duties of prudence and loyalty.[22]

---

[21] The alpha calculation benchmark is the Russell 1000 Growth TR USD index.
[22] When asset management companies such as Defendants favor retention of their own funds when acting as service providers, this favoritism has empirically resulted in worse performance within defined contribution plans. Veronica Pool et al., *It Pays the Menu: Mutual Fund Investment Options in 401(k) Plans*, 71 J. FIN. 1779 (Aug. 2016). Further, this poor performance tends to persist, empirically demonstrating that "the decisions to retain poorly performing affiliated funds is not driven by information about the future performance of these funds." *Id.* at 1781, 1808-10. Another study similarly shows that plans administered by asset management firms tend to have the highest fees and the lowest net returns, and that both the higher fees and lower returns are attributable to the use of proprietary mutual funds. Thomas Doellman & Sabuhi Sardarli, *Investment Fees, Net Returns, and Conflict of Interest in 401(k) Plans*, 39 J. FIN. RES. 5 (Spring 2016).

**CLASS ACTION COMPLAINT**

II.   **PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' CONDUCT AND PRUDENT ALTERNATIVES**

74.   Until shortly before this suit was filed, Plaintiffs did not know all of the material facts (including, among other things, the investment options and menu choices of fiduciaries of similarly sized plans, the costs of the Plan's investments compared to those in similarly sized plans, and the availability of superior investment options) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA. Further, Plaintiffs did not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including their processes for selecting, monitoring, evaluating, and removing Plan investments) because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

75.   Plaintiffs seek certification of this action as a class action under Federal Rule of Civil Procedure 23 and ERISA's derivative action provisions, 29 U.S.C. § 1109 and 1132(a)(2).

76.   Plaintiffs assert their claims on behalf of a class of participants and beneficiaries of the Plan defined as follows:[23]

> All participants and beneficiaries of the Allianz Asset Management of America L.P. 401(k) Savings and Retirement Plan who were invested in the AllianzGI or PIMCO funds at any time on or after December 27, 2017, excluding any persons with responsibility for the Plan's administrative functions or investments.

---

[23] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

**CLASS ACTION COMPLAINT**

77.    <u>Numerosity</u>:    The Class is so numerous that joinder of all Class members is impracticable. The Plan had between 4,156 and 4,710 participants at all relevant times during the applicable period, many of whom were invested in the AllianzGI or PIMCO funds.

78.    <u>Typicality</u>:   Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are Plan participants and suffered financial harm because of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members with regard to the Plan. Defendants' imprudent and disloyal decisions affected all Plan participants similarly.

79.    <u>Adequacy</u>:   Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and Plaintiffs have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

80.    <u>Commonality</u>: Common legal and factual questions exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

       a.  Whether Defendants are fiduciaries with respect to the Plan;

       b.  Whether Defendants breached their fiduciary duties by engaging in the conduct described herein;

       c.  Whether Allianz breached its duty to monitor other Plan fiduciaries;

       d.  The proper form of equitable and injunctive relief; and

       e.  The proper measure of monetary relief.

81.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

-28-
**CLASS ACTION COMPLAINT**

82.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of prospective equitable relief by the Court would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

83.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members and a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will remove the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
### Breach of Duties of Loyalty and Prudence
### 29 U.S.C. § 1104(a)(1)(A)–(B)

84.     As alleged above, Defendants are fiduciaries with respect to the Plan and are subject to ERISA's fiduciary duties.

**CLASS ACTION COMPLAINT**

85.    29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in connection with their administration of the Plan and their selection and monitoring of the Plan's investments and recordkeeping platform.

86.    Defendants breached these fiduciary duties by engaging in the conduct described herein. Among other things, Defendants failed to employ a prudent and loyal process for selecting, monitoring, and reviewing the AllianzGI and PIMCO funds, and gave an improper and unjustified preference to these funds over superior, less expensive alternative available options.

87.    Instead of acting in Plan participants' best interest, Defendants' conduct was propelled by a desire to drive revenues and profits to themselves, and to promote their own business interests. Accordingly, Defendants failed to discharge their duties with respect to the Plan solely in the interest of Plan participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

88.    Further, each of the actions and omissions described in paragraphs 86-87 above and elsewhere in this Complaint demonstrate that Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of 29 U.S.C. § 1104(a)(1)(B).

89.    Because of Defendants' breaches, the Plan and its participants suffered millions of dollars in losses throughout the statutory period. Defendants are liable, under 29 U.S.C. §§ 1109 and 1132, to make good to the Plan all losses resulting from these fiduciary breaches, and to restore to the Plan any profits that they captured through the use of Plan assets or which resulted from such fiduciary breaches. In

addition, Defendants are liable for additional equitable relief and other relief as provided by ERISA and applicable law.

## COUNT II

### Failure to Monitor Fiduciaries (against Allianz)

90.    As alleged throughout the Complaint, Allianz is a fiduciary of the Plan under 29 U.S.C. § 1002(21)(A). Because it has overall oversight responsibility for the Plan and the specific responsibility to appoint and remove members of the Committees, Allianz has a fiduciary responsibility to monitor the performance of the Committees and its members and to ensure that they are complying with the terms of the Plan and ERISA's statutory requirements. *See* 29 C.F.R. § 2509.75-8 (FR-17).

91.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries are not meeting their fiduciary obligations.

92.    Allianz breached its fiduciary monitoring duties by, among other things:

    a.    Failing to monitor and evaluate the performance of the Committees or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committees' imprudent actions and omissions with respect to the Plan;

    b.    Failing to monitor the Committees' fiduciary processes, which would have alerted a prudent fiduciary to the breached of fiduciary duties described herein; and

    c.    Failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing proprietary investments

**CLASS ACTION COMPLAINT**

within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

93.     Because of Allianz's breach of the duty to monitor, the Plan suffered millions of dollars of losses due to excessive fees and investment underperformance.

94.     Under 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Allianz is liable to restore to the Plan all losses suffered as a result of its failure to properly monitor the Committees, and to restore to the Plan any profits that it captured through the use of Plan assets or which resulted from its failure to properly monitor the Committees. In addition, Allianz is liable for additional equitable relief and other relief as provided by ERISA and applicable law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Rocke and Collins, individually and as representatives of the Class defined herein, and on behalf of the Plan, pray for relief as follows:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A declaration that Defendants breached their fiduciary duties under ERISA;

D.     An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described herein, and to restore the Plan to the position it would have been in but for this unlawful conduct;

E.     An accounting for profits earned by Allianz, and a subsequent order requiring Allianz to disgorge all profits received from, or in respect of, the Plan;

**CLASS ACTION COMPLAINT**

F.  An order granting equitable restitution and other appropriate equitable monetary relief against Defendants including, but not limited to, imposition of a constructive trust on all assets of the Plan transferred to Allianz as a result of Defendants' unlawful conduct in violation of ERISA, or a surcharge against Allianz to prevent unjust enrichment from unlawful conduct involving the Plan;

G.  An order enjoining Defendants from any further violations of ERISA;

H.  An order requiring replacement or removal of certain investments in the Plan;

I.  An order requiring removal of the Plan's fiduciaries and replacement with an independent fiduciary;

J.  Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate;

K.  An award of pre-judgment interest;

L.  An award of attorneys' fees and costs under 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

M.  An award of such other and further relief as the Court deems equitable and just.

Dated: January 12, 2023

**KELLNER LAW GROUP PC**

By: /s/ *richard kellner*

Richard L. Kellner, CA Bar No. 171416
1180 South Beverly Drive, Suite 610
Los Angeles, CA 90035
Telephone: 310-780-6759
Facsimile: 310-277-0635
rlk@kellnerlaw.com

**NICHOLS KASTER, PLLP**
Paul J. Lukas, MN Bar No. 22084X*
Brock J. Specht, MN Bar No. 0388343*
Caroline E. Bressman, MN Bar No. 0400013*
* *pro hac vice* applications forthcoming
4700 IDS Center
80 S 8th Street
Minneapolis, MN 55402

-33-
**CLASS ACTION COMPLAINT**

Telephone: 612-256-3200
Facsimile: 612-338-4878
lukas@nka.com
bspecht@nka.com
cbressman@nka.com

ATTORNEYS FOR PLAINTIFFS

**CLASS ACTION COMPLAINT**