1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**
9                    **CENTRAL DISTRICT OF CALIFORNIA**
10                          **SOUTHERN DIVISION**

11  **CHAD ROCKE, CHRISTOPHER**              )    **Case No.: SACV 23-00098-CJC (KESx)**
12  **COLLINS, and EMILY LIU,**              )
     **individually, as representatives of the**  )
13  **class, and on behalf of the Allianz Asset** )    **ORDER GRANTING IN**
     **Management of America, L.P. 401(k)**    )    **SUBSTANTIAL PART PLAINTIFFS'**
14  **Savings and Retirement Plan,**          )    **MOTIONS FOR FINAL**
                                              )    **SETTLEMENT APPROVAL [Dkt. 62]**
15                                            )    **AND FOR ATTORNEY FEES, COSTS,**
                                              )    **AND CLASS REPRESENTATIVE**
16              **Plaintiffs,**              )    **SERVICE AWARDS [Dkt. 59]**
17        **v.**                             )
                                              )
18  **ALLIANZ ASSET MANAGEMENT OF**          )
     **AMERICA LLC, INVESTMENT**              )
19  **COMMITTEE OF THE ALLIANZ**             )
     **ASSET MANAGEMENT OF**                  )
20  **AMERICA 401(K) SAVINGS AND**           )
     **RETIREMENT PLAN, and DOES 1–30,**      )
21                                            )
22                                            )
             **Defendants.**                 )
23                                            )
24  ──────────────────────────────────       )
25
26
27
28

## I.    INTRODUCTION

In this putative class action, Plaintiffs Chad Rocke, Christopher Collins, and Emily Liu assert claims against Defendants Allianz Asset Management of America LLC ("AAM") and Investment Committee of the Allianz Asset Management of America 401(k) Savings and Retirement Plan under the Employee Retirement Income Security Act ("ERISA") relating to the management of the Allianz Asset Management of America 401(k) Savings and Retirement Plan (the "Plan").  (Dkt. 41 [First Amended Complaint, hereinafter "FAC"].)  The parties reached a proposed settlement agreement (the "Settlement").  (Dkt. 54-3 [Settlement Agreement, hereinafter "SA"].)   After the Court granted preliminary approval of the Settlement, (Dkt. 55 [hereinafter "Prelim. Appr. Order"]), the settlement administrator, Analytics Consulting, LLC ("Analytics"), sent notice to the 6,834 class members.  (Dkt. 62-4 [Declaration of Jeffrey Mitchell, hereinafter "Mitchell Decl."] ¶ 7.)  No one has objected to the Settlement, and an independent fiduciary reviewed the Settlement and opined that its terms are fair, reasonable, and adequate.  (Dkt. 59-2 [Declaration of Brock J. Specht].)  Now before the Court are Plaintiffs' motions for final settlement approval, (Dkt. 62 [hereinafter "Mot."]), and for attorney fees, costs, and service awards, (Dkt. 59 [hereinafter "Fee Mot."]).  For the following reasons, Plaintiffs' motions are **GRANTED IN SUBSTANTIAL PART**.

## II.    BACKGROUND

### A.    Factual and Procedural Background

In 2015, two plaintiffs, on behalf of themselves, a class, and the Plan, filed an ERISA case alleging that the Plan's fiduciaries imprudently managed its investments and maintained a Plan lineup consisting exclusively of funds managed by entities affiliated with the Plan sponsor, without considering alternative investments from other companies

that were less expensive and performed better in many instances. (FAC ¶ 46 [citing *Urakhchin v. Allianz Asset Mgmt. of Am., L.P., et al.*, No. 8:15-cv-01614-JVS-JCG (C.D. Cal. Oct. 15, 2015) ("*Allianz I*")].) The *Allianz I* case settled. (*Id.* ¶ 47 [citing *Allianz I* Dkt. 174-1 at 10].) The *Allianz I* settlement required the Plan to retain the services of an unaffiliated investment consultant to provide an annual evaluation of the Plan's investment lineup and review the Plan's investment policy statement. (*Id.*); *see Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, 2018 WL 8334858, at *2 (C.D. Cal. July 30, 2018), *judgment entered,* 2018 WL 8334847 (C.D. Cal. July 30, 2018).

Plaintiffs allege despite the *Allianz I* settlement's requirements, Defendants "continue to employ disloyal and imprudent practices in maintaining the Plan's investment lineup that existed well before the prior litigation," including by "retained the vast majority of the Plan's proprietary mutual funds." (FAC ¶¶ 48–49.) "Significantly, at no point since the *Allianz I* settlement have Defendants offered any non-proprietary investment options in the Plan. Moreover, Defendants continue to retain the vast majority of the proprietary funds that were included in the Plan prior to the settlement, with only two funds being removed for reasons other than their liquidation by the fund manager." (*Id.* ¶ 55.) According to Plaintiffs, Plan participants incurred excessive fees and losses because Defendants failed to remove underperforming proprietary funds. (*Id.* ¶¶ 60–80.)

On January 17, 2023, Plaintiffs Rocke and Collins filed this case alleging that AAM breached its ERISA fiduciary duties by applying an imprudent and disloyal process for managing the Plan, resulting in an unwarranted preference for overpriced and poorly performing investments affiliated with AAM. (Dkt. 1.) Defendants moved to dismiss Plaintiffs' Complaint, (Dkt. 32), and before the Court ruled on the motion, Plaintiffs filed the FAC adding Plaintiff Liu and additional allegations (Dkt. 41).

After Plaintiffs filed the FAC, the parties met and conferred regarding a possible settlement. (Mot. at 2.) The Court granted their joint request for a stay to allow for targeted discovery and time to engage in settlement negotiations. (*Id.* [citing Dkts. 49–50].) In discovery, Defendants produced several documents including the Plan's Investment Policy Statement, the Plan's contract with a third-party advisor, and documents related to revenue sharing rebates the Plan secured. (Dkt. 54-2 [Specht Decl.] ¶ 13.) The parties then successfully negotiated the Settlement. (Mot. at 2.)

## B.    Proposed Settlement Terms

Under the Settlement, Defendants agree to pay a Gross Settlement Amount of $7.5 million to a common Settlement Fund. (SA ¶ 2.31.) The Net Settlement Amount—the Gross Settlement Amount minus Court-approved attorney fees and costs, administrative expenses, and class representative service awards—will be distributed to eligible Class Members according to the Plan of Allocation, which allocates settlement proceeds among Class Members based on their Average Qualifying Account Balance compared to the sum of all Class Members' Average Qualifying Account Balances. (*Id.* ¶¶ 6.1–6.13.) Class members need not submit claims. Rather, current Plan participants will have their Plan accounts automatically credited with their share of the Settlement Fund, and authorized former participants will receive a direct payment by check unless they elect to have their distribution rolled over to an individual retirement account or eligible employer plan by submitting a Former Participant Claim Form. (*Id.* ¶¶ 6.5–6.6.)

As part of the Settlement, Defendant will also, for no less than three years, retain the services of an unaffiliated investment consultant to (1) evaluate the suitability of the Plan's investment structure, including the number of investments, asset classes, and investment styles offered, (2) evaluate annually its investments, including each investment's fees and performance compared to a suitable peer group and specific,

unaffiliated options in the same asset class, and (3) evaluate the suitability of replacing the Plan's current capital preservation option with a Stable Value Fund.  (*Id.* ¶ 7.1.)

In exchange for the Settlement's benefits, participating class members agree to release claims based on any of the allegations in the Complaint or FAC or that arise out of the institution, prosecution, or settlement of this case, that would be barred by *res judicata* based on the Court's entry of a final approval order, that relate to the direction to calculate, the calculation of, or the method or manner of the allocation of the settlement fund under the Plan of Allocation, or that relate to the Independent Fiduciary's approval of the Settlement unless brought against the Independent Fiduciary alone.  (*Id.* ¶ 2.41.)

C.    **Notice and the Class's Response**

After the Court granted preliminary approval of the Settlement, Defendant's counsel gave Analytics a list of the 6,834 class members' names and addresses.  (Mitchell Decl. ¶ 5.)  Analytics gave email notice to 4,736 of those class members and mailed notice to the rest.  (*Id.* ¶ 7.)  When 135 email notices bounced, Analytics mailed notice to the affected class members.  (*Id.* ¶ 9.)  When 147 of the mailed notices were returned as undeliverable, Analytics performed a skip trace and re-mailed notice to the 109 people for whom it could locate a new address.  (*Id.* ¶ 10.)  In total, out of 6,834 Class Members, only 38 notices were ultimately undeliverable.  (*Id.* ¶ 11.)  On February 15, 2024, Analytics sent a supplemental notice to class members' most current email or mailing address to correct an inaccurate description of the Settlement's prospective relief.  (*Id.* ¶¶ 12–13.)  Analytics also created a settlement website and a toll-free telephone number.  (*Id.* ¶¶ 14–15.)  The deadline for class members to object to the Settlement has now passed.  (*See* Dkt. 61 [resetting objection deadline to February 26, 2024].)  Analytics has not become aware of any objection to the settlement, (Mitchell Decl. ¶ 16), and no objection has been filed on the docket.

## III.    DISCUSSION

In deciding whether to grant Plaintiffs' motions for final approval and attorney fees, the Court analyzes (1) whether to certify a class for settlement purposes and (2) the fairness of the Settlement.

### A.    Class Certification

A plaintiff seeking class certification must satisfy two sets of requirements under Federal Rule of Civil Procedure 23: Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy, and Rule 23(b)'s requirement that the action fall within one of the three "types" of classes described in its subsections.  Here, Plaintiffs seek certification under Rule 23(b)(1), which allows certification "if prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class," *id.* 23(b)(1)(A), or "if prosecuting separate actions by or against individual class members would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests," *id.* 23(b)(1)(B).  The Court previously concluded that Plaintiffs presented sufficient evidence to show that the proposed class satisfies Rule 23's requirements.  (*See* Prelim. Appr. Order at 5–11.)  Having reviewed those requirements again, the Court adopts its prior analysis regarding class certification and grants certification of the proposed class for settlement purposes only.  *See Atzin v. Anthem, Inc.*, 2022 WL 4238053, at *3 (C.D. Cal. Sept. 14, 2022) ("Nothing has changed to disturb [the court's prior] conclusion, and class certification remains appropriate.").

**B.    Fairness of the Proposed Settlement**

Although there is a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned," *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998), a settlement of class claims requires court approval. Fed. R. Civ. P. 23(e).  This is because "[i]ncentives inhere in class-action settlement negotiations that can, unless checked through careful district court review of the resulting settlement, result in a decree in which the rights of class members, including the named plaintiffs, may not be given due regard by the negotiating parties." *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003) (cleaned up).

Rule 23(e) governs approval of class action settlements.  Courts may approve such settlements only when they are "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2). In evaluating a settlement, courts must consider whether (1) the class representatives and class counsel have adequately represented the class, (2) the proposal was negotiated at arm's length, (3) the relief provided for the class is adequate, and (4) the proposal treats class members equitably relative to each other.  Fed. R. Civ. P. 23(e)(2)(A–D).

**1.    Plaintiffs' and Class Counsel's Adequacy**

Plaintiffs and class counsel have adequately represented the class.  There is no evidence of a conflict of interest between Plaintiffs and the class.  Plaintiffs' claims are identical to those of the class, and they have every incentive to vigorously pursue those claims.  Plaintiffs' counsel—Richard Kellner of Kellner Law Group PC and Paul J. Lukas, Brock J. Specht, and Brock J. Specht of Nichols Kaster, PLLP—is likewise adequate.  They have extensive experience litigating ERISA class actions, including *Allianz I*.  (*See* Dkt. 54-2 [Specht Decl.] ¶¶ 15–23; Dkt. 59-2 ¶¶ 7–9; Mot. at 9–10.)  One court even recognized Nichols Kaster as "one of the relatively few firms in the country

that has the experience and skills necessary to successfully litigate a complex ERISA

action such as this." *Karpik v. Huntington Bancshares Inc.*, 2021 WL 757123, at *9

(S.D. Ohio Feb. 18, 2021). And counsel have ably litigated this case to date, efficiently

securing a significant settlement. *See Allianz I*, 2018 WL 8334858, at *6 ("Plaintiffs

point out that Class Counsel dealt with a notoriously complex area of the law and were

able to negotiate a settlement prior to a lengthy trial process. The quality of Class

Counsel's work is further evidenced by the favorable settlement achieved, including both

monetary and prospective relief.") (citation omitted).

## 2. Arm's Length Negotiations

The Settlement, which provides class members substantial benefit, appears to be

the result of vigorous arm's length negotiations between the parties and their experienced

counsel. (*See* Mot. at 10–11.) And as discussed in more detail in Section III.B.3.c., the

Court's review of possible "'subtle signs' of collusion" in the Settlement causes the Court

no doubt that the Settlement resulted from good faith, arm's length negotiations between

the parties. *See Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1048 (9th Cir. 2019);

*Briseno v. ConAgra Foods, Inc.*, 998 F.3d 1014, 1022 (9th Cir. 2021).

## 3. Adequacy of Class Relief

In determining whether the class's relief is "adequate," courts consider "(i) the

costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of

distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3)." *Id.* 23(e)(2)(C).[1]   The Court finds the Settlement's relief to be adequate.

### a.    Costs, Risks, and Delay of Trial and Appeal

The $7.5 million Settlement reflects a substantial outcome for class members. Even if the Court approved all requested fees and expenses, each class member would receive over $1,000.  (Dkt. 54-2 [Specht Decl.] ¶ 4.)  Moreover, the Settlement recovery represents approximately 28% of Plaintiffs' maximum measure of damages—an extremely significant outcome for the class.  (*Id.* ¶ 5; Mot. at 12.)  Indeed, not only is this percentage higher than the percentage secured in the *Allianz I* settlement, but it also compares favorably to percentage recoveries approved in other ERISA settlements.  *See Allianz I*, 2018 WL 3000490, at *4 (C.D. Cal. Feb. 6, 2018) (preliminarily approving $12 million settlement representing "approximately 25.5%" of damages); *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (finding fair and adequate ERISA settlement representing 16% recovery); *Baird v. BlackRock Institutional Tr. Co., N.A.*, 2021 WL 5113030, at *5 (N.D. Cal. Nov. 3, 2021) (granting final approval of settlement representing approximately 28.4% of damages, which the court noted was "within the range of other similar ERISA settlements"); *Marshall v. Northrop Grumman Corp.*, 2020 WL 5668935, at *2 (C.D. Cal. Sept. 18, 2020) (finding that $12.375 million settlement fund, representing approximately 29% of the plaintiffs' claimed damages on ERISA claims, was "an exceptional result for the Class"); *Reyes v. Bakery & Confectionery*

---

[1] Before Congress codified these factors in 2018, courts applied the following factors in determining whether a settlement was fair, reasonable, and adequate: "[1] the strength of plaintiffs' case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the risk of maintaining class action status throughout the trial; [4] the amount offered in settlement; [5] the extent of discovery completed, and the stage of the proceedings; [6] the experience and views of counsel; [7] the presence of a governmental participant; and [8] the reaction of the class members to the proposed settlement." *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1048 (9th Cir. 2019); *Staton*, 327 F.3d at 959.  The Court still considers these factors to the extent they shed light on the Rule 23(e) inquiry.

*Union & Indus. Int'l Pension Fund*, 281 F. Supp. 3d 833, 847 (N.D. Cal. 2017) (finding settlement amount of 25% of the plaintiffs' damages in ERISA case was reasonable and favored approval).

The benefits class members will receive under the Settlement present a fair compromise given the costs, risks, and delay of trial and appeal.  Although litigation had not progressed far in this case, the parties had the benefit of the previously described research, experience, discovery, and motion practice.  With that information, the parties were able to realistically value the scope of Defendants' potential liability and assess the costs, risks, and delay of moving forward with class certification, motion practice, and trial.  *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (explaining that approving the settlement is favored when the "parties have sufficient information to make an informed decision about settlement" (cleaned up)).

Those costs and risks are not insignificant.  Because this case is in the beginning stages, substantial litigation costs would be required to take this case to trial.  "Numerous depositions and document and other written discovery would be required if the case continued."  *Farrar v. Workhorse Grp., Inc.*, 2023 WL 5505981, at *7 (C.D. Cal. July 24, 2023).  "Extensive and expensive expert discovery would also be necessary."  *Id.*  And there would be significant costs and risks associated with class certification, summary judgment, and trial.  *See In re Portal Software, Inc. Sec. Litig.*, 2007 WL 4171201, at *3 (N.D. Cal. Nov. 26, 2007) ("Additional consideration of increased expenses of fact and expert discovery and the inherent risks of proceeding to summary judgment, trial and appeal also support the settlement."); *In re Netflix Privacy Litig.*, 2013 WL 1120801, at *6 (N.D. Cal. Mar. 18, 2013) ("The notion that a district court could decertify a class at any time is one that weighs in favor of settlement." (citation omitted)).  Even if Plaintiffs were able to certify a class, there would also be a risk that the Court could later decertify the class.  *See In re Netflix Privacy Litig.*, 2013 WL 1120801, at *6 (N.D. Cal. Mar. 18,

2013) ("The notion that a district court could decertify a class at any time is one that weighs in favor of settlement."). Moreover, there also was a chance that Defendants could have prevailed on the merits, including on their arguments that some of Plaintiffs' claims were time-barred, that Plaintiffs could not show Defendants were imprudent or disloyal, and that AAM is an improper defendant. (*See generally* Dkt. 32 [Motion to Dismiss].)

These considerations weigh heavily in favor of approving the Settlement. *See Rodriguez*, 563 F.3d at 966; *Curtis-Bauer v. Morgan Stanley & Co., Inc*., 2008 WL 4667090, at \*4 (N.D. Cal. Oct. 22, 2008) ("Settlement avoids the complexity, delay, risk and expense of continuing with the litigation and will produce a prompt, certain, and substantial recovery for the Plaintiff class."). Indeed, they are even more acute in this ERISA case given that "ERISA is a complex field that involves difficult and novel legal theories and often leads to lengthy litigation." *Krueger v. Ameriprise Fin., Inc.*, 2015 WL 4246879, at \*1 (D. Minn. July 13, 2015). Finally, even if Plaintiffs could secure a better result than the Settlement represents at trial, any result obtained after additional litigation or trial would take significantly longer and there is a risk that Plaintiffs could have received much less, or nothing at all. *See In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1041–42 (N.D. Cal. 2008) (discussing how a class action settlement offered an "immediate and certain award" in light of significant obstacles posed through continued litigation).

The Settlement removes these costs and risks "by ensuring class members a recovery that is certain and immediate, eliminating the risk that class members would be left without any recovery at all." *Graves v. United Indus. Corp.*, 2020 WL 953210, at \*7 (C.D. Cal. Feb. 24, 2020) (cleaned up); *see In re Cobra Sexual Energy Sales Pracs. Litig.*, 2021 WL 4535790, at \*6 (C.D. Cal. Apr. 7, 2021); *see also Kruger v. Novant Health, Inc.*, 2016 WL 6769066, at \*5 (M.D.N.C. Sept. 29, 2016) (noting that early

settlement of an ERISA "case benefits the employees and retirees" because (1) "the class will receive compensation and be able to invest those funds immediately, rather than having to wait as long as a decade as other classes in similar 401(k) cases have had to do," (2) "the affirmative relief . . . will go into effect now, as opposed to several years from now, which allows a class to achieve substantial savings and be able to invest those savings immediately – enjoying years' worth of returns that would not otherwise be available," and (3) "by settling this case before entering into the formal discovery stage, let alone trial, Class Counsel avoided substantial litigation costs and expenses to the class"). "It also secures a settlement now rather than imposing the delay of additional litigation, which in this case could span years." *Farrar v. Workhorse Grp., Inc.*, 2023 WL 5505981, at *7 (C.D. Cal. July 24, 2023). This factor strongly suggests the Settlement's adequacy.

### b.    Effectiveness of Proposed Method of Distributing Relief

Next, the Court must consider "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e)(2)(C). "Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment. "A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding." *Id.*

Here, the relief distribution is straightforward. To receive payment under the Settlement, class members did not have to file a claim or take any other action. Current participants' Plan accounts will automatically be credited with their share of the Settlement Fund, and authorized former participants will receive a check unless they chose to have their distribution rolled over to an individual retirement account or eligible

employer plan by submitting a Former Participant Claim Form. (SA ¶¶ 6.5–6.6; *see* Mot. at 14.) This procedure is not unduly demanding or otherwise inadequate.

### c.    Award of Attorney Fees and Costs

Next, the Court must consider "the terms of any proposed award of attorneys' fees, including timing of payment." Fed. R. Civ. P. 23(e)(2)(c). When reviewing attorney fee requests in class action settlements, courts have discretion to apply the percentage-of-the-fund method or the lodestar method to determine reasonable attorney fees. *See Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000); *Bluetooth*, 654 F.3d at 944–45. Here, counsel seeks a fee award of 25% of the Gross Settlement Amount, or $1,875,000, plus reimbursement of $9,630.73 in litigation costs and $40,796 in settlement administration expenses. (Fee Mot. at 7.)

In considering proposed attorney fee awards, courts must scrutinize settlements for three factors that tend to show collusion: (1) when counsel receives a disproportionate distribution of the settlement, (2) when the parties negotiate a "clear sailing arrangement," under which the defendant agrees not to challenge a request for agreed-upon attorney fees, and (3) when the agreement contains a "kicker" or "reverter" clause that returns unawarded fees to the defendant rather than the class. *Briseno*, 998 F.3d at 1022.

The Court previously raised for the parties' attention the Settlement's "clear sailing" arrangement. (Prelim. Appr. Order at 17–18 [citing SA ¶ 8.2].) While the arrangement is troubling, it is not a "death knell," *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 610 (9th Cir. 2021), and after "peer[ing] into the provision and scrutiniz[ing] closely the relationship between attorneys' fees and benefit to the class," *Kim v. Allison*, 8 F.4th 1170, 1180 (9th Cir. 2021) (citation omitted), the Court determines that the

presence of the clear sailing agreement does not indicate collusion in this case. As the Court has explained, the Settlement provides a substantial recovery for the class. *See Singh v. Roadrunner Intermodal Servs. LLC*, 2019 WL 316814, at *7–8 (E.D. Cal. Jan 24, 2019) (granting final approval despite clear sailing provision, finding "that the requested fees are justified and do not betray the class's interests" and that "[o]n balance, the court is satisfied that the settlement is not the product of collusion"). Moreover, the inference of collusion from a clear sailing arrangement is diminished when class counsel's fees are "to be made from the settlement fund," *Rodriguez v. W. Pub'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009), and "when the agreement lacks a reversionary or 'kicker provision,'" *In re Toys "R" Us-Del., Inc.—Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 458 (C.D. Cal. 2014) (citation omitted). *See also Swain v. Anders Grp., LLC*, 2023 WL 2976368, at *10 (E.D. Cal. Apr. 17, 2023) ("Moreover, the collusion concerns raised by the clear sailing provision are minimized, however, because any fees not awarded will be distributed to the class, not revert to Anders."); *Musgrove v. Jackson Nurse Pros., LLC*, 2022 WL 18231364, at *6 (C.D. Cal. June 24, 2022) (similar). That is the case here. (Mot. at 11.)

The fee counsel seeks is also not "disproportionate." *See Bluetooth*, 654 F.3d at 947. The Ninth Circuit has held that 25% of a settlement fund is the "benchmark" for a reasonable fee award. *Id.* at 942–43. In deciding whether "'special circumstances' justify[ ] a departure" upward or downward from the benchmark, *id.* at 942, courts typically consider (1) the size of the fund, (2) the quality of the results achieved, (3) the risk counsel undertook, (4) the skill required and the quality of work, (5) the contingent nature of the fee and the financial burden carried by the plaintiff, and (6) awards made in similar cases. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048–50 (9th Cir. 2002).

Counsel's request for a benchmark fee award is appropriate. "The overall result and benefit to the class from the litigation is the most critical factor in granting a fee

award," and class members are receiving a very significant benefit from this litigation because of counsel's effort. *In re Omnivision Techs.*, 559 F. Supp. 2d at 1046. Indeed, class members will receive an average of over $1,000 without taking any action at all. (Dkt. 54-2 [Specht Decl.] ¶ 4.) The risk of litigation was real and substantial. "As Plaintiffs identify, ERISA 401(k) litigation is risky and even had Plaintiffs prevailed on the merits, there would be significant uncertainty as to a damage award following trial." *Allianz I*, 2018 WL 8334858, at *6; *see generally Henderson v. Emory Univ.*, 2020 WL 9848978, at *3 (N.D. Ga. Nov. 4, 2020) ("The commitment to litigation like this may require tens of thousands of hours, years of litigation, trial, appeals, and other proceedings. Given this reality, despite Class Counsel's success in similar litigation, few law firms have the necessary expertise and are willing take the risk and devote the substantial resources necessary, all at risk of nonpayment, to litigate these complex ERISA claims."). The fee was also contingent. (Fee Mot. at 15.) In other words, "[c]ounsel have received no compensation for their efforts during the course of litigation, and they undertook representation despite substantial risk that none of their expenses on behalf of the class would be recouped." *Allianz I*, 2018 WL 8334858, at *6. Moreover, counsel agrees that "[t]here [are] no special circumstances here indicating that the 25% benchmark award [is] either too small or too large." *See In re MGM Mirage Sec. Litig.*, 708 F. App'x 894, 897–98 (9th Cir. 2017); (*see* Fee Mot. at 9).[2]

The Court has also reviewed counsel's request for $9,630.73 in litigation costs incurred for expenses including court fees, service of process costs, computer research

---

[2] In the unique circumstances of this case, when counsel efficiently secured a significant settlement of a complex case following a previous settlement regarding the same issues involving the same Defendant, the Court determines that a lodestar calculation is not a helpful cross-check to the benchmark award. *See Chambers v. Whirlpool Corp.*, 980 F.3d 645, 663 (9th Cir. 2020) (confirming that a lodestar cross-check is "ordinarily" not required but encouraging one "for mixed settlements involving both coupon and non-coupon relief"); *see also Bolton v. U.S. Nursing Corp.*, 2013 WL 5700403, at *5 (N.D. Cal. Oct. 18, 2013) ("In a common fund case, a lodestar method does not necessarily achieve the stated purposes of proportionality, predictability and protection of the class and can encourage[] unjustified work and protracting the litigation.").

costs, data hosting and storage costs, postage and mailing, and courier service costs.
(Dkt. 59-2 [Specht Decl.] ¶¶ 18–19.)  These are generally the types of expenses that are
reasonably and necessarily incurred in litigation and routinely charged to paying clients
in non-contingency cases.  *See Bato v. Lab'y Corp. of Am. Holdings*, 2011 WL
13412376, at *17 (C.D. Cal. Mar. 14, 2011) (explaining that discovery costs "paved the
way for settlement," and computerized legal research "was necessary to examine the
legal basis for plaintiffs' claims" and to oppose a motion to dismiss").  The Court finds
the requested costs to be reasonable and sufficiently supported.

    The Court will make one change, however, in calculating class counsel's fee: it
will apply the benchmark percentage after deducting litigation and administration costs
from the common fund.  Calculating counsel's percentage fee before deducting expenses
would mean that counsel not only gets reimbursed for their costs but also receives an
additional 25% of those costs as a fee.  *See, e.g.*, *Smith v. Experian Info. Sols., Inc.*, 2020
WL 6689209, at *7 (C.D. Cal. Nov. 9, 2020) (calculating benchmark fees by deducting
litigation costs and settlement administrator costs from the settlement amount, and taking
25% of that amount); *In re Apple iPhone/iPad Warranty Litig.*, 40 F. Supp. 3d 1176,
1182 (N.D. Cal. 2014) (same); *Kmiec v. Powerwave Techs., Inc.*, 2016 WL 5938709, at
*5 (C.D. Cal. July 11, 2016) (same); *Kanawi v. Bechtel Corp.*, 2011 WL 782244, at *3
(N.D. Cal. Mar. 1, 2011) (same).  And deducting the settlement administrator's and
independent fiduciary's expenses before calculating the fee ensures that class counsel's
incentive remains keeping those costs low.  *See Farrar*, 2023 WL 5505981, at *10.
Subtracting from the $7.5 million Settlement amount $28,296 in settlement
administration costs, $9,630.73 in litigation costs, and $12,500 in costs associated with
the independent fiduciary yields $7,449,573.27.  (*See* Fee Mot. at 7.)  Applying the 25%
benchmark rate to that sum yields $1,862,393.32.  Accordingly, the Court will award
class counsel $1,862,393.32 in attorney fees.

In addition to the amount of counsel's fees and costs, the Court must scrutinize the timing of payment. Fed. R. Civ. P. 23(e)(2)(c). The Settlement provides that counsel's fees and costs and class members' Settlement Fund payments will be distributed within forty-two calendar days of the Settlement Effective Date. (SA ¶ 5.9.) Since "counsel will receive payment at the same time as Class Members, . . . the timing of payment does not weigh against" final approval of the Settlement. *Razo v. AT&T Mobility Servs., LLC*, 2022 WL 4586229, at *13 (E.D. Cal. Sept. 29, 2022); *see Perks v. Activehours, Inc.*, 2021 WL 1146038, at *6 (N.D. Cal. Mar. 25, 2021) (similar).

### d.    Any Agreement Made in Connection with the Proposal

The Court must also consider whether there is "any agreement required to be identified under Rule 23(e)(3)," Fed. R. Civ. P. 23(e)(2)(C)(iv)—that is, "any agreement made in connection with the proposal," *id.* 23(e)(3). The parties have identified no agreement other than the Settlement. (Mot. at 15–16.)

### e.  Class Members' Reaction to the Settlement

Finally, in assessing the Settlement's adequacy the Court considers class members' reaction to it. As explained, Analytics successfully gave notice to 6,796 out of 6,834 class members. (Mitchell Decl. ¶¶ 7–11.) No one submitted an objection to the Settlement. (Mot. at 6; Mitchell Decl. ¶ 16.) This indicates strong overall support for the Settlement and weighs in favor of granting final approval. *See, e.g.*, *Kacsuta v. Lenovo (United States) Inc.*, 2014 WL 12585787, at *5 (C.D. Cal. Dec. 16, 2014) ("Because the reaction of the class to settlement has been almost entirely positive, with only two objections, this factor favors final approval."); *Hashemi II*, 2022 WL 18278431, at *6 ("Very few objections and opt-outs create a strong presumption that the Settlement is beneficial to the Class and thus warrants final approval."); *In re Lifelock, Inc. Mktg. &*

*Sales Practices Litig.*, 2010 WL 3715138, at *6 (D. Ariz. Aug. 31, 2010) (explaining that low number of timely written objections and requests for exclusion supported settlement approval); *National Rural Telecomms. Cooperative v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004) ("It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members.").  The class representatives have also submitted declarations affirming their support for the Settlement.  (Dkts. 54-7, 54-9, 54-11.)

One class member, Joseph P. Healy, wrote counsel a letter containing "two recommendations," (Dkt. 59-5), which the parties resolved with Mr. Healy and which in any case do not identify any reason the proposed Settlement would be unfair, inadequate, or unreasonable.  *See Browne v. Am. Honda Motor Co.*, 2010 WL 9499072, at *15 (C.D. Cal. July 29, 2010) ("When considering class members' objections, . . . the district court must evaluate whether they identify reasons why the proposed settlement may be unfair.").  First, Mr. Healy suggested that assets in the Plan's self-directed brokerage account ("SDBA") be excluded from the Settlement allocation.  (*See* Dkt. 59-5 at 1–2.)  Class Counsel met with Mr. Healy to better understand this suggestion and then researched and investigated it, including asking Defendants for additional data regarding assets held in the SDBA.  (Mot. at 16.)  Both Mr. Healy and the independent fiduciary accepted counsel's ultimate determination that "the investments in the Plan's SDBA likely suffered from the same alleged opportunity costs as the investments in the Plan's core menu, including a lack of adequate fiduciary oversight and excessive fees," and its conclusion "that there was no compelling basis to exclude the SDBA funds from the allocation calculation."  (*Id.* at 16 –17.)  To the extent Mr. Healy's "suggestion" remains a live issue, the Court agrees with counsel's conclusion that "excluding assets held in the SDBA from the Settlement allocation would not make the allocation of Settlement funds

more equitable among class members and risk[s] reducing or eliminating the recovery to Class Members who were injured by the alleged misconduct." (*Id.*)

Second, based on his misunderstanding that the notice's statement that class counsel would seek "compensation for the Named Plaintiffs of no more than $7,500 each" would create a "cap" on class member recovery, Mr. Healy suggested that "the $7,500 cap appl[y] only to the three plaintiffs who brought the action, not to all class members." (Dkt. 59-5 at 2.)  "Class Counsel spoke with Mr. Healy and informed him that there is no cap on the Class Member allocations," so this issue appears to have been resolved as well.  (Mot. at 17 n.10.)

Finally, the Court notes regarding reaction to the Settlement that an independent fiduciary, Newport Trust Company ("Newport Trust"), reviewed and approved it.  (Mot. at 7; Dkt. 62-3 [Statement of Independent Fiduciary, hereinafter "Newport Trust Statement"].)  Pursuant to ERISA regulations and paragraph 3.1 of the Settlement, Newport Trust reviewed and analyzed documents and information related to this case, court filings, and the Settlement terms, including the amount class members received, the release, the amount of attorney fees requested, and the proposed Plan of Allocation. (Newport Trust Statement at 2.)  It also interviewed the parties' counsel and evaluated the strengths and weaknesses of the parties' legal and factual arguments.  (*Id.*)  It concluded:

> (i) the Settlement terms, including the scope of the release of claims, the $7.5 million Settlement amount and non-monetary relief provided for in the Settlement, and the amount of any attorneys' fee award or any other sums to be paid from the recovery, are reasonable in light of the Plan's likelihood of full recovery, the risks and costs of litigation, and the value of claims foregone; (ii) the terms and conditions of the transaction are no less favorable to the Plan than comparable arms-length terms and conditions that would have been agreed to by unrelated parties under similar circumstances; and (iii) the

transaction is not part of an agreement, arrangement, or understanding designed to benefit a party in interest.

(*Id.* at 3.)  As a result, Newport Trust [] determined that the Plan should not object to the Settlement or any portion thereof, including but not limited to the requested attorneys' fees and costs, and as such authorize[d] the Plan's participation in the Settlement.  (*Id.*)

In sum, after examining the Rule 23(e)(2) factors, the Court concludes that the Settlement is "fair, reasonable, and adequate."

### 4.  Equitable Class Member Treatment

The final Rule 23(e) factor turns on whether the proposed settlement "treats class members equitably relative to each other."  Fed. R. Civ. P. 23(e)(2).  "Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief."  Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment.

Under the Settlement, class members may receive differing payouts depending on their Average Qualifying Account Balances.  (*See* Mot. at 16.)  This difference in treatment is appropriate and reasonable.  The release is also the same for all class members.  The Court finds that the Settlement treats class members equitably.

### 5.  Incentive Awards

Plaintiffs also seek service awards of $7,500 each for the three class representatives.  (Fee Mot. at 7.)  Incentive or service awards are payments to class representatives for their service to the class in bringing the lawsuit.  *Radcliffe v. Experian*

*Info. Sols. Inc.*, 715 F.3d 1157, 1163 (9th Cir. 2013). Such awards "encourage individuals to undertake the responsibilities and risks of representing the class and recognize the time and effort spent in the case." *In re Anthem*, 2018 WL 3960068, at *30. They "are fairly typical in class action cases" and are discretionary. *Rodriguez*, 563 F.3d at 958; *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 499 (E.D. Cal. 2010). In the Ninth Circuit, a $5,000 incentive award is "presumptively reasonable." *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 266 (N.D. Cal. 2015); *see Harris v. Vector Marketing Corp.*, 2012 WL 381202, at *7 (N.D. Cal. Feb. 6, 2012) (collecting cases); *see also In re Apple Inc. Device Performance Litig.*, 50 F.4th at 787 (confirming that "[s]o long as [incentive awards] are reasonable, they can be awarded"). When evaluating the reasonableness of incentive awards, courts consider "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions," and the time the plaintiff spent pursing the litigation. *Staton*, 327 F.3d at 977.

When the Court granted preliminary approval of the $7,500 awards, it advised that it would "require further information justifying the awards at final approval," given the fact that "[t]his case did not progress very far before the parties reached the Settlement" and the work the plaintiffs stated they did justifying the awards "appear[ed] to be ordinary tasks that are not particularly burdensome." (Prelim. Appr. Order at 20.) The Court stated that it would "expect a fuller showing at final approval that awarding $7,500 to each of the three plaintiffs is reasonable and appropriate." (*Id.*) Although the Court recognizes that the class representatives helped counsel achieve an excellent result for the class and the incentive awards form a very small percentage of the overall recovery, Plaintiffs have not made a sufficient showing justifying $7,500 service awards, and the Court instead grants them $5,000 service awards.

Plaintiffs first contend $7,500 service awards are justified because "they invested several hours of personal time." (Fee Mot. at 20.) But "several hours" of time is not particularly significant or sufficient to justify an award above the amount courts consider presumptively reasonable. *Cf. Baird v. BlackRock Institutional Tr. Co., N.A.*, 2021 WL 5113030, at \*9 (N.D. Cal. Nov. 3, 2021) (finding $10,000 service awards for each ERISA plaintiff reasonable to compensate them for their 61 and 51.25 hours of efforts over four years of litigation, the reputational risk they undertook to participate in a lawsuit against their prior employer and colleagues, and their "understandabl[e] concern[] that their ability to return to work in the financial industry is now impaired"). Indeed, the *Allianz I* court approved $7,500 service awards to the two named plaintiffs, who took time off work and went through the work and stress of appearing for a deposition and attending mediation. *Allianz I*, 2018 WL 8334858, at \*8. It does not seem appropriate to the Court that the class representatives in this case receive the same service award when they performed far less work and made far less sacrifice.

Plaintiffs also contend that $7,500 service awards are justified because "the Class Representatives assumed significant reputational and other risks associated with suing a former employer," (Fee Mot. at 20), and because "the protection of retirement funds is a great public interest" and "private attorneys general have a major role to play in ERISA litigation," (*id.* at 21 [quoting *Fastener Dimensions, Inc. v. Mass. Mut. Life Ins. Co.*, 2014 WL 5455473, at \*9 (S.D.N.Y. Oct. 28, 2014)]). But the Court is not persuaded that the reputational or other risks in this case were extraordinary or that either of these considerations justifies an award beyond what courts consider presumptively reasonable.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' motions for final approval and for fees, costs, and service awards are **GRANTED IN SUBSTANTIAL PART**. The Court **GRANTS**

final approval of the Settlement.  Class counsel is awarded $1,862,393.32 in attorney fees and $9,630.73 in costs.  The Court approves Analytics' fees of $28,296 and the $12,500 in costs associated with the independent fiduciary.  The three class representatives shall receive service awards of $5,000 each.


DATED:      March 18, 2024

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE


**CC: FISCAL**